**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Melville O'Neal ATKINSON,
Defendant–Appellant.**

No. 91–30084.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1992.

Decided April 27, 1992.

As Amended July 22, 1992.

Stephen C. Moses, Moses Law Firm, Billings, Mont., for defendant-appellant.

Kris A. McLean, Asst. U.S. Atty., Helena, Mont., for plaintiff-appellee.

Before: HUG, NOONAN and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Melville O'Neal Atkinson was convicted of twenty-one felony violations of the Lacey Act for his role in organizing and guiding several illegal hunting expeditions. 16 U.S.C. §§ 3372(a)(2)(A), 3372(c)(1).

At trial, the jury was required to decide whether the value of the game taken during these illegal hunts exceeded $350, the threshold for determining whether a violation constitutes a felony under the Act. 16 U.S.C. § 3373(d)(1)(B). The jury was instructed that, in calculating the value of the game, it could consider the amount Atkinson charged his clients to participate in a hunt. Atkinson's fee ranged from $1,500 to $3,000 per hunter.

Atkinson appeals, arguing that the jury should only have been allowed to consider the market price of the animals' parts in determining their value under the Act. He also challenges his conviction and sentence on a number of alternate grounds. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2) and we affirm.

## FACTUAL BACKGROUND

Atkinson owned and operated Neal's Wilderness Outfitters, Inc., a Jacksonville, Florida business which organized deer hunting expeditions in the State of Montana. He charged a base fee of $1,500 to participate in a hunt. In return, he provided meals, lodging and guide services. He also promised to supply each hunter with a valid Montana state hunting license.

Atkinson split his outfitting fee with Wayne Bacon and Brian Nelson. In return, Bacon and Nelson let the hunters stay at their Montana ranch. They also helped Atkinson guide the hunts.

During November 1989, Atkinson arranged for three separate hunting expeditions. He took three hunters on the first trip. Atkinson charged each of them the standard $1,500 outfitting fee, plus $200 for a Montana state hunting license. He also charged an additional $500 for a special "outfitters tag," which he claimed would allow each of them to kill a second deer.[1] Atkinson never obtained licenses

---

1. Under Montana Code § 87–3–103, a hunting license allows its holder to take one game ani-

for the hunters, nor did he provide them with any special hunting tags. Despite his knowledge that the hunters were violating Montana law by hunting without licenses, *see* Montana Code § 87-2-103, he proceeded to guide them on a series of illegal hunts.

The hunters killed a total of three deer during the trip. Two of these were taken at night with the aid of a spotlight, also in violation of Montana law. Montana Code § 87-3-101. After the hunt, Atkinson arranged to ship all three deer back to Florida.

Later that month, Atkinson took five more hunters to Montana. He charged them each an outfitting fee of $1,600, plus $200 for a Montana state hunting license. Each hunter also agreed to pay Atkinson an additional $800 if he killed a second deer.

All but one of the hunters received a valid license. Atkinson arranged for that hunter to use a fake license. Atkinson also provided three of the hunters with additional deer tags. These tags allowed each of them to kill one doe in addition to the buck they were already licensed to take. Atkinson instructed them to use the doe tag on their first kill, regardless of the deer's sex, in order to save their buck tags for a later hunt. Montana law makes it illegal to improperly tag game. Montana Code § 87-2-509.

Each of the three hunters killed a large buck and, as Atkinson had instructed, tagged it with their doe tag. One of the hunters also killed a deer during an illegal nighttime hunt. At the end of the hunt, Atkinson again arranged to ship the deer back to the hunters' homes in Florida and Georgia.

Atkinson accompanied John Campbell and Charles Brown on the third hunt.

Each paid an outfitting fee,[2] plus an additional $200 for a hunting license. Although Atkinson never provided these licenses, he assured both hunters that because there were so few game wardens in the area, he was sure they would "get away with it."

Campbell killed a deer on the first day of the hunt. Brown killed two deer a few days later. Because Brown lacked a valid deer tag, Bacon, the ranch owner who also served as a guide, agreed to place one of his own tags on Brown's second kill. Brown paid Atkinson an additional $200 for this tag. After the hunt, Atkinson arranged for Campbell to illegally purchase another hunter's unused tag so he could ship his deer back to Florida.

The Montana Department of Fish, Wildlife and Parks eventually became aware of Atkinson's activities. As a result, the Department arranged for South Carolina State Conservation Officers Larry McClain and Tommy Norris to book a hunting trip with Atkinson's agency. Although both officers paid the standard $1,500 outfitting fee, neither was charged for, or received, a Montana state hunting license. Atkinson told Norris to buy a bird-hunting license, in case he was stopped by a game warden.[3]

During the hunt, each officer killed one deer. Norris placed Nelson's deer tag on his kill because he did not have a tag of his own. At Atkinson's direction, Norris later paid Nelson $200 for the tag. After the hunt, McClain paid Atkinson an additional $100 to ship his deer back to South Carolina.

Atkinson was eventually arrested by Montana state game wardens and charged with twenty-three violations of the Lacey Act. Bacon and Nelson both testified against Atkinson at trial, as did a number

mal per year unless special authorization is obtained from the Montana Department of Fish, Wildlife and Parks. ·

2. Brown testified that he actually paid Atkinson between $1,800 and $2,000 for arranging the trip. Campbell apparently traded Atkinson auto body work worth between $2,500 and $2,800 for his spot in the hunt.

3. When McClain originally booked his trip, he told Atkinson that he already possessed a fake Montana state hunting license. During the trip, he and Atkinson joked about the fact that McClain was hunting under a bogus license. At trial, Bacon testified that Atkinson had also arranged for Norris to use a license issued in the name of Mike Key.

of Atkinson's former clients. Atkinson was convicted of twenty-one violations of the Act and sentenced to thirty-seven months in federal prison. This appeal followed.

## VALUATION

■ The Lacey Act makes it unlawful to sell or transport in interstate commerce wildlife taken in violation of state law. 16 U.S.C. § 3372(a)(2)(A). Under this section, a person "sells" wildlife in violation of the Act whenever, for money or other consideration, he offers or provides "guiding, outfitting, or other services" or "a hunting or fishing license or permit" for the illegal taking of wildlife. 16 U.S.C. 3372(c)(1).[4] A violation of section 3372 is punishable by five years imprisonment, a fine of $20,000, or both, provided the market value of the animals sold exceeded $350. 16 U.S.C. § 3373(d)(1)(B).

The market value of wildlife under the Lacey Act is a factual question reserved for the jury. *Stenberg*, 803 F.2d at 433. The trial judge instructed the jury that it could determine the market value of the deer sold by Atkinson either by the price each deer would bring if sold on the open market (less than $150 each in this case), or by the "price paid for guiding services for the hunt in which the wildlife was taken." Atkinson argues that the court erred in allowing the jury to consider the price of his guide services in determining the market value of the deer.

*United States v. Todd*, 735 F.2d 146 (5th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985), is the only case directly addressing the method for determining the market value of an animal killed during a guided hunt. Todd was a commercial guide who specialized in arranging illegal airborne hunts. He charged between $1,000 and $5,000 for his services. Todd appealed his conviction under the Lacey Act, arguing that the trial court improperly considered the cost of his guide services in calculating the market value of the animals killed by his clients. The Fifth Circuit held that because an offer to provide guide services is an offer to sell wildlife under the Act, "[t]he best indication of the value of the game 'sold' in this manner is the price of the hunt." *Id.* at 152. *Todd* was decided before the Lacey Act was amended to include section 3372(c). Consistent with section 3372(c), we conclude that *Todd* sets forth the proper method for valuing game taken on a guided hunt.

■ A violation of section 3372(c) does not involve a "sale" of game in the traditional sense; rather, under section 3372(c) the commodity being "sold" is the opportunity to illegally hunt game with the assistance of a guide. *See Stenberg*, 803 F.2d at 436 (an ordinary person would view the sale of guiding services "as providing the buyer the opportunity to kill wildlife, ... [not] an actual sale of the wildlife itself"). As a result, the value of an animal taken in a guided hunt bears little relation to the market price of its parts. Instead, as the Fifth Circuit recognized in *Todd*, its market value is best represented by the amount a hunter is willing to pay for the opportunity to participate in the hunt. *Todd*, 735 F.2d at 152.

Atkinson relies on *Stenberg* to support his contention that an animal's market value under the Act can only be determined by the aggregate value of its parts on the open market. In *Stenberg*, the trial court had allowed the jury to consider the cost of guide services in calculating the market value of game killed during a hunt. *Stenberg*, 803 F.2d at 432. Stenberg argued that this was an improper method for determining an animal's market value under the Lacey Act. We never resolved the valuation issue, because we concluded that

---

4. In *United States v. Stenberg*, 803 F.2d 422 (9th Cir.1986), we held that the sale of wildlife under the Lacey Act did not encompass the sale of guide services. The Act was amended in 1988 to include section 3372(c). Pub.L. 100–653, § 101(3), 102 Stat. 3825 (1988). The express purpose of this amendment was to overturn our holding in *Stenberg*. *See* S.Rep. No. 100–653, 100th Congress, 2d Sess. 9–10 ("This amendment would overturn the decision in *United States v. Stenberg* [citation omitted], which held that ... the term 'sale of wildlife' does not include the provision of guiding services."), *reprinted in* 1988 U.S.C.C.A.N. 5366, 5374.

an offer to provide guide services was not a "sale" under the Act. *Id.* at 437. Consequently, *Stenberg* offers little guidance on the proper method for determining the market value of an animal taken during a guided hunt.

■ Atkinson also suggests an alternate method for determining market value in this case. Montana Code § 87–1–111 requires a person convicted of illegally killing a deer to "reimburse" the state $300. Atkinson argues that this figure should be conclusive of a deer's market value for purposes of the Act. We reject this argument. Atkinson has produced no evidence that Montana intended section 87–1–111 to define the market value of deer taken in violation of state law. Nor do the fines established under this code section appear to bear any resemblance to the actual market values of the animals listed.

## JURY INSTRUCTIONS

Atkinson raises three more challenges to the district court's jury instructions. First, he argues that the trial court improperly read certain portions of his indictment to the jury. Second, he claims that the court's aiding and abetting instruction was inadequate. Finally, he contends that the court erred by refusing to give two of his proposed jury instructions. None of these arguments is persuasive.

### A. Indictment

■ The decision to read an indictment to the jury is within the sound discretion of the trial court. *United States v. Polizzi,* 500 F.2d 856, 876 (9th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Given the complexity of this case, the court did not abuse its discretion when it attempted to clarify the charges against Atkinson by reading them directly from the indictment.

5. Although the standard for reviewing the denial of a proposed jury instruction is unsettled in this circuit, *United States v. Sotelo–Murillo,* 887

### B. Aiding and Abetting Instructions

Atkinson also argues the trial court's instructions failed to inform the jury that they could convict Atkinson of aiding and abetting only if they first found he assisted in the commission of a crime.

"When reviewing a claim of error relating to jury instructions, the instructions must be viewed as a whole." *United States v. Marabelles,* 724 F.2d 1374, 1382 (9th Cir.1984). Here, the court gave the jury a number of instructions outlining the elements necessary to convict Atkinson of aiding and abetting. When read together, these instructions clearly informed the jury they could convict Atkinson only if they found he took some affirmative step to assist in the commission of a crime. This was sufficient.

### C. Atkinson's Proposed Instructions

Atkinson proposed two additional jury instructions. First, he asked for an instruction clarifying the meaning of "taking game" under Montana law. Second, he sought an instruction on the requirements for tagging deer in Montana. He contends that the trial court erred in refusing to give either of these proposed instructions.

"A defendant is entitled to an instruction concerning his theory of the case if it is supported by law and has some foundation in the evidence." *United States v. Echeverry,* 759 F.2d 1451, 1455 (9th Cir.1985). Here, neither instruction was relevant to the issues presented at trial. Consequently, the trial court did not err in rejecting them.[5]

## SUFFICIENCY OF THE EVIDENCE

Atkinson argues that the evidence presented was insufficient to support his convictions for conspiring to violate the Lacey Act. He also contends that the evidence failed to show he sold or transported wildlife in interstate commerce as required under the Act.

F.2d 176, 179–80 (9th Cir.1989), our conclusion in this case is the same under either a de novo or abuse of discretion standard.

■ In deciding whether evidence is sufficient to support a conviction, we examine the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## A. Conspiracy

■ "The elements of [a] conspiracy are (1) an agreement to accomplish an illegal objective, (2) coupled with one or more acts in furtherance of the illegal purpose, and (3) the requisite intent to commit the underlying substantive offense." *United States v. Pemberton,* 853 F.2d 730, 733 (9th Cir. 1988). The agreement giving rise to a conspiracy need not be explicit. *United States v. Thomas,* 887 F.2d 1341, 1347 (9th Cir. 1989).

There was ample evidence of a conspiracy among Atkinson, Bacon and Nelson. Bacon and Nelson expressly agreed with Atkinson to provide guide services for unlicensed hunters. Further, they agreed to sell their own deer tags to these hunters in violation of Montana law.

Atkinson also conspired with the hunters who accompanied him to Montana. Atkinson agreed to guide these hunters knowing they were not legally authorized to hunt game. On the few occasions he was questioned about the need for hunting licenses, he either arranged to provide the hunters with fake licenses or encouraged them to hunt without licenses. He also agreed to conduct illegal nighttime hunts. Finally, he plotted with at least three hunters to unlawfully mistag their kills.

Given this evidence, a reasonable jury could have found that Atkinson conspired to violate the Lacey Act.

## B. Interstate Transport

■ Atkinson also argues the evidence failed to show he either sold or transported wildlife in interstate commerce as required under the Act. *See* 16 U.S.C. § 3372(a)(2)(A). We disagree.

At the end of each hunt, Atkinson either arranged to ship the deer carcasses to hunters' homes outside the State of Montana, or assisted the hunters in these shipments. This satisfies the Act's interstate commerce requirement. *See United States v. Gay–Lord,* 799 F.2d 124, 126 (4th Cir. 1986) (Lacey Act satisfied when defendant "knew that [wildlife] would be transported in interstate commerce and took the steps that began their travel to interstate markets").[6]

## SENTENCING GUIDELINES

Atkinson argues that the district court improperly increased his base offense level under the United States Sentencing Guidelines for: (1) committing an offense under the Lacey Act involving wildlife with a market value in excess of $20,000 (section 2Q2.1); (2) acting as the organizer of a criminal activity involving five or more participants (section 3B1.1); and (3) obstructing justice (section 3C1.1).

## A. Sentencing Guideline § 2Q2.1

■ Sentencing Guideline § 2Q2.1(b)(3)(A) provides for an increase in a defendant's base offense level for smuggling or unlawfully dealing in wildlife with a market value greater than $2,000. The amount of this increase is determined by reference to the table at section 2F1.1. When the market value of game exceeds $20,000, the table requires an increase of four levels. The district court found that the aggregate market value of the deer in this case was $21,000.

Atkinson argues that section 2Q2.1 is inapplicable because deer are not "specially protected" wildlife. He also contends that even if deer are specially protected, the market value of the deer taken did not justify the four-level increase imposed by the trial court.

---

**6.** The indictment did not charge, nor does the government contend, that Atkinson violated the Lacey Act by arranging for the hunters to cross state lines to hunt deer. Accordingly, we do not consider whether this would satisfy the Act's interstate commerce requirement.

Atkinson's argument that section 2Q2.1 does not apply to "ordinary" wildlife taken in violation of the Lacey Act is contrary to the history of the section. Prior to November 1, 1989, the Guidelines contained two separate provisions dealing with the unlawful sale of wildlife. Section 2Q2.1 expressly applied only to "specially protected" animals, while section 2Q2.2 applied to all violations of the Lacey Act. On November 1, 1989, section 2Q2.2 was deleted and consolidated with section 2Q2.1. *See* U.S.S.G., app. C, amend. 209 (1990). Although the consolidated version of section 2Q2.1 initially retained the reference to "specially protected" wildlife, *see* U.S.S.G. § 2Q2.1 (1989), this language was deleted two years later, *see* U.S.S.G. § 2Q2.1 (1991). Atkinson contends that because he was sentenced before the reference to "specially protected" wildlife was deleted in 1991,[7] section 2Q2.1 cannot be used to enhance his sentence. We disagree.

We give substantial deference to a subsequent Guideline amendment "when it plainly serves to clarify rather than change the existing law." *United States v. Martinez*, 946 F.2d 100, 102 (9th Cir.1991). It is clear from the commentary to the 1991 amendment that the deletion of the words "specially protected" clarified, rather than changed, section 2Q2.1(b)(3)(A). U.S.S.G., app. C, amend. 407 (1991) ("this amendment removes language inadvertently retained when this guideline was consolidated with the former § 2Q2.2"). This view is also supported by the 1990 commentary to section 2Q2.1(b)(3)(A). As this commentary shows, section 2Q2.1(b)(3)(A) was never intended to apply solely to "specially protected" wildlife after its consolidation. Rather, it was intended to apply to violations of several different animal protection statutes, including the Lacey Act. *See* U.S.S.G. § 2Q2.1 commentary (1990) ("[t]his section applies to violations of the ... Lacey Act"). We therefore conclude there is no distinction between specially protected wildlife and wildlife taken in vio-

lation of the Lacey Act under the consolidated version of section 2Q2.1.

Atkinson argues that even if this section applies, the market value of the deer in this case did not warrant a four-level increase in his sentence. The district court calculated the market value of the deer by multiplying Atkinson's standard outfitting fee ($1,500) by the number of deer killed (14). The result was a total market value of $21,000. As the district court correctly concluded, this corresponds to a four-level increase under section 2F1.1.

## B. Sentencing Guideline § 3B1.1(a)

 Atkinson's sentence was enhanced four levels because the trial court found he "organize[d] ... a criminal activity that involved five or more participants...." U.S.S.G. § 3B1.1(a) (1990). Atkinson argues that his sentence was improperly increased under this section because none of the hunters qualified as a "participant."

For purposes of section 3B1.1, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 Application Note 1 (1990); *see also United States v. Anderson*, 942 F.2d 606, 615 (9th Cir.1991) ("participant" under section 3B1.1 means "criminally responsible person").

Each of the hunters was criminally responsible for illegally buying game in violation of the Lacey Act. *See* 16 U.S.C. § 3372(c)(2)(A) (buying guiding, outfitting or other services is a "purchase of wildlife" under the Act). Thus, even though none of the hunters was prosecuted, all twelve of them qualified as "participants" under Guideline section 3B1.1(a).

Finally, each of the four hunts involved Atkinson,[8] Wayne Bacon and Brian Nelson (the two guides/ranch owners), as well as at least two hunters. Thus, even if the four hunts are viewed as separate criminal

---

7. Because Atkinson was sentenced on February 15, 1991, the 1990 version of the Guidelines was still in effect.

8. The defendant may be considered in calculating the total number of participants for purposes of section 3B1.1. *United States v. Preakos*, 907 F.2d 7, 10 (1st Cir.1990).

activities, each involved five or more participants.

## C. Sentencing Guideline § 3C1.1

 The district court also increased Atkinson's sentence because it found he obstructed justice by instructing Campbell and Brown to lie to federal agents during the investigation. Under section 3C1.1, a two-level increase is warranted where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation...."

Campbell testified that Atkinson contacted him several weeks after the hunt and told him not to speak with the police about his trip to Montana. Atkinson also helped Campbell concoct a story to tell the authorities if he was forced to discuss the hunt. He instructed Brown in the same manner.

The district court did not err in determining that Atkinson obstructed justice under section 3C1.1.

## CONCLUSION

We affirm the appellant's conviction and sentence on all counts.