**PUBLISH**

**September 13, 2012**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff–Appellee,

v.

MARLIN JACKSON BUTLER; JAMES
BOBBY BUTLER, JR.,

      Defendants–Appellants.

Nos. 11-3199 &
11-3202

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:10-CR-10089-WEB-1-2)**

---

Melanie Susan Morgan, Morgan Pilate LLC (Roger Falk and Kurt P. Kerns with her on
the briefs), for the Defendants-Appellants.

Colin L. Black (Ignacia S. Moreno and Robert J. Lundman, with him on the briefs), U.S.
Department of Justice, Environmental Defense Section, Washington, DC, for the
Plaintiff-Appellee.

---

Before **LUCERO**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Brothers James and Marlin Butler sold guided deer hunts to out-of-state hunters, providing lodging, meals, and guiding services. On several occasions, they encouraged their clients to violate state hunting laws. Both pled guilty to conspiring to sell and transport poached deer in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d). Tasked with calculating the fair market value of the poached deer for sentencing purposes, the district court concluded that the value of each deer was the total amount that a client paid to participate in the guided hunt. Based on this determination, the court sentenced the Butlers to several years' imprisonment, required that they pay substantial fines and restitution to Kansas, and imposed special conditions of supervision prohibiting both men from hunting, fishing, or trapping wildlife.

We conclude that because the value assigned to loss of wildlife must reflect the actual value of the animals involved, the district court erred in conflating the value of the deer with the full price of a guided hunt. We also conclude that the district court improperly imposed James Butler's special conditions of supervision without considering whether those conditions would interfere with his lawful employment. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand.

**I**

The Butlers sold guided hunts to out-of-state hunters seeking to shoot trophy bucks in Comanche County, Kansas. On a typical guided hunt, the brothers would drive the client to an assigned tree stand, remain with the client for most of the hunt, facilitate the bagging of the deer, and assist the client in retrieving and field-dressing the carcass.

-2-

Clients were provided with lodging, food, transportation, and other accommodations. Depending on the type of weapon used by the client, the Butlers charged approximately $3,500 to $5,000 for a guided hunt.

These operations frequently ran afoul of hunting laws and regulations; for example, the Butlers would encourage their clients to hunt without a valid license, use illegal equipment, shoot more bucks than authorized, and fail to tag carcasses. Following an extensive investigation into these illegal activities by federal agents, both brothers were charged with numerous violations of the Lacey Act, which prohibits the transportation and sale of unlawfully killed wildlife in interstate commerce. 16 U.S.C. § 3372(a)(2)(A). They were also charged with conspiring to violate the Lacey Act. In addition, James Butler was charged with three counts of obstruction of justice.

By pretrial motion, the parties asked the district court to decide the method by which it would determine the market value of the unlawfully killed deer. This inquiry was important for two reasons: a felony violation of the Lacey Act requires proof that the felled wildlife was worth at least $350, see § 3373(d)(1)(B), and the United States Sentencing Guidelines allow a substantial enhancement based on the wildlife's market value, see U.S.S.G. § 2Q2.1(b)(3)(A). Following the court's determination that the proper valuation is the amount that a hunter paid for a guided hunt, the brothers pled guilty to conspiring to violate the Lacey Act. James Butler also pled guilty to one felony violation of the Lacey Act and one count of obstruction of justice, and Marlin Butler pled guilty to a distinct substantive Lacey Act violation.

-3-

At James Butler's sentencing, the court stood by its valuation method and calculated that the total value of the animals involved was $120,000, which resulted in an eight-level enhancement. Over James' objection, the court also imposed a four-level enhancement for his having been a leader or organizer of the illegal hunting operation. Accounting for these enhancements, the court sentenced James to forty-one months' imprisonment—at the top of the Guidelines range—and imposed $25,000 in restitution to the Kansas Department of Wildlife and Parks, plus a $25,000 fine to be credited to the Lacey Act Reward Fund. Special conditions of supervision were imposed on James that prohibited him from hunting, fishing, trapping, or accompanying anyone engaging in such activities.

Marlin Butler's sentencing progressed in a similar fashion. The district court concluded that the deer he helped poach were worth $120,000. On this determination, together with a three-level leader or supervisor enhancement, Marlin was sentenced to twenty-seven months' imprisonment. He was required to pay $10,000 in restitution to Kansas and a $10,000 fine to the Lacey Act Reward Fund. Similar conditions of supervision were imposed on Marlin.

Both brothers appeal the district court's method of determining the market value of the deer. James also appeals the application of the leader or organizer sentencing enhancement, the propriety of identifying Kansas as a victim under the Mandatory Victims Restoration Act ("MVRA"), 18 U.S.C. § 3663A, the scope of his special conditions of supervision, and the substantive reasonableness of his sentence.

-4-

## II

In 1900, Congress passed the Lacey Act, now the nation's oldest federal wildlife protection statute, in order to squelch the market for illegally procured wildlife. Act of May 25, 1900, ch. 553, 31 Stat. 187. By 1981, however, the Act's effectiveness was diminished in light of booming international commerce related to wildlife. H.R. Rep. No. 97-276, at 7 (1981). Thus, Congress amended the Lacey Act to correct its insufficiencies and simplify its administration and enforcement. Lacey Act Amendments of 1981, Pub. L. 97-79, 95 Stat. 1073; see also S. Rep. No. 97-123, at 2 (1981), reprinted in 1981 U.S.C.C.A.N. 1748, 1749.[1]

Following these amendments, the Ninth Circuit held in United States v. Stenberg, 803 F.2d 422, 437 (9th Cir. 1986), that the sale of wildlife under the revised Lacey Act did not encompass the sale of guide services. In response, Congress again amended the Act in 1988 to supersede Stenberg's holding. See Pub. L. 100-653, § 101(3), 102 Stat. 3825, 3825 (1988); see also United States v. Atkinson, 966 F.2d 1270, 1273 n.4 (9th Cir. 1992). Significantly, the 1988 amendments added subsection 3372(c), which expands the definition of selling and purchasing wildlife to include guiding, outfitting, and providing a license or permit for the illegal taking of wildlife. 16 U.S.C. § 3372(c).

---

[1] For a detailed recounting of the passage of the Lacey Act, see Robert S. Anderson, The Lacey Act: America's Premier Weapon in the Fight Against Unlawful Wildlife Trafficking, 16 Pub. Land L. Rev. 27, 36-41 (1995).

# A

We begin our analysis by considering the Butlers' challenge to the district court's valuation of the deer. In doing so, we review factual findings for clear error, and legal conclusions, including interpretations of the Guidelines, de novo. United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006); United States v. Hawthorne, 316 F.3d 1140, 1145 (10th Cir. 2003).

The central point of controversy is the meaning of the term "market value" as used in Guidelines § 2Q2.1. For poaching offenses, § 2Q2.1 provides for an increase in offense level based on the "market value of the fish, wildlife, or plants." This provision is complemented by § 2B1.1(b)(1), which provides a sliding scale of offense-level increases ranging from a two-level increase if the value of the wildlife exceeds $5,000 to a 30-level increase if the value of the wildlife is greater than $400,000,000. § 2B1.1(b)(1).

Neither of these Guideline provisions defines "market value." However, an application note instructs that:

> When information is reasonably available, "market value" under subsection (b)(3)(A) shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation (e.g., taxidermy) cost. Market value, however, shall not be based on measurement of aesthetic loss (so called "contingent valuation" methods).

§ 2Q2.1 app. n.4. We must treat this commentary as "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of,

that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

The application note mandates a two-part inquiry. First, a district court must attempt to discern the "fair-market retail price" of an animal. § 2Q2.1 app. n.4. If, and only if, "the fair-market retail price is difficult to ascertain," a court can instead "make a reasonable estimate" of the price using "reliable information." Id. In other words, a district court must make a factual determination that the fair-market retail price is not readily available before resorting to estimation of the animal's value.

We discern two potential bases upon which to sustain the district court's use of guiding fees to determine the market value of the deer. First, the district court's determination could be upheld if the guiding fees represent the "fair-market retail price" of the animals. Id. Alternately, the guiding fees could be used as a "reasonable estimate" if the district court first appropriately found that "the fair-market retail price is difficult to ascertain." Id.

**1**

In ordinary usage, the phrase "fair-market retail price" is most naturally read as the price a willing buyer would pay to a willing seller for the deer in question. See United States v. Dobbs, 629 F.3d 1199, 1203 (10th Cir. 2011) (interpretation of an undefined term should be "guided by its ordinary, everyday meaning"). This court has previously interpreted the similar phrase "fair market value" as "the price at which a willing buyer and willing seller with knowledge of all the relevant facts would agree to exchange the property or interest at issue." Estate of True v. Comm'r, 390 F.3d 1210, 1217 (10th Cir.

2004). We see no reason to depart from this definition. The guiding fees in this case, which included accommodations and other incidental costs, do not correspond to the "fair-market retail price" of an animal itself under the ordinary meaning of that phrase. That a deer was shot on a luxury hunting expedition rather than a more rustic outing is of no import to a buyer of venison.

In attacking this common-sense conclusion, the government relies on a Ninth Circuit case with similar facts to the case at bar. In United States v. Atkinson, 966 F.2d 1270 (9th Cir. 1992), the court held that the entire cost of a guided hunt could be counted as the value of an animal for purposes of U.S.S.G. § 2Q2.1. Atkinson, 966 F.2d at 1276. The bulk of the Ninth Circuit's market-value analysis, however, was based not on the Guidelines we must interpret but on a provision of the Lacey Act, 16 U.S.C. § 3373(d)(1)(B), that requires a minimum $350 loss to trigger certain criminal penalties. Atkinson, 966 F.2d at 1273-74. In concluding that the full cost of a guided hunt is countable, the court relied on an amendment to the Lacey Act that deemed guiding and outfitting to be impermissible "sales." Id. at 1273 (citing 16 U.S.C. § 3372(c)). Because "the commodity being 'sold' is the opportunity to illegally hunt game with the assistance of a guide," the court reasoned that the full fee charged by the defendant was the relevant "market value" under the Lacey Act. Id. After reaching this conclusion as to the meaning of the market value under the statute, the Atkinson court applied that same definition to U.S.S.G. § 2Q2.1 without conducting an independent analysis of the latter provision. Atkinson, 966 F.2d at 1276. The opinion makes no mention of the Guidelines

commentary that we must treat as authoritative.

The government urges us to follow Atkinson and conclude that the total price paid for a guided hunt constitutes the "fair-market retail price" as that phrase is used in the Guidelines commentary. But Atkinson's line of reasoning with respect to the statutory issue—that the Lacey Act deems a guided hunt to be a "sale"—does not apply to the Guidelines provision we must interpret. Section 2Q2.1 does not use the term "sale." Instead, it instructs courts to determine the market value of flora and fauna when sentencing defendants convicted of "offenses involving fish, wildlife, and plants." Id. (emphasis added, capitalization omitted). The fact that the Lacey Act defines a guided hunt as a "sale" has no relevance to the Guidelines provision before us, which governs several statutes other than the Lacey Act. See U.S.S.G. Appendix A. Thus, to the extent that Atkinson holds that the entire cost of a hunt constitutes the "fair-market retail price" of a targeted animal for purposes of § 2Q2.1 application note 4, we respectfully disagree with its conclusion. We hold that the "fair-market retail price" must be the price of the animal itself, not the price of an expedition to hunt the animal.

**2**

The government also argues that the district court's loss determination can be upheld on the theory that the actual "fair-market retail price" of the deer was difficult to ascertain. Thus, the government contends, the Guidelines commentary allowed the district court to use the cost of a guided hunt as a "reasonable estimate" of the animals' value. § 2Q2.1 app. n.4. Upon review of the record, however, this argument is also

untenable.

In ruling on the Butlers' objections to the presentence investigation report ("PSR"), the district court stated that "[i]n this instance, where there is no ready market value and out-of-the-ordinary 'trophy' animals are involved, the court concludes that the amount paid by hunters for guided hunts represents the most reasonable estimate of fair market value of the wildlife." Thus, the court—at least arguably—made the required finding that market value was difficult to ascertain. However, the government does not point to any evidence to support this conclusion, nor does independent examination of the record reveal any. To the contrary, the government actually submitted evidence suggesting that a trophy deer could be readily priced: a table of the going price of "typical" and "non-typical" antlers of various sizes. Perhaps there was no ready market for a trophy buck's meat and hide—making a true market price of the animal difficult to calculate—but there is no evidence in the record to support such a conclusion, and it is certainly conceivable that such a market exists.

The government bears the burden of proving facts to support a sentence enhancement. See United States v. Tindall, 519 F.3d 1057, 1063 (10th Cir. 2008). And the Guidelines instruct that before endeavoring to estimate the price of a deer, a sentencing court must find that the actual retail market price is difficult to ascertain. § 2Q2.1 app. n.4. Because the record in this case does not contain evidence to support the district court's apparent finding that the retail price was difficult to ascertain, we must reverse its conclusion. See United States v. Campbell, 372 F.3d 1179, 1182-83 (10th Cir.

2004) (reversing factual finding at sentencing because it lacked support in the record).

We remand to allow the district court to ascertain the actual retail market value of the deer. See id. at 1183 ("[T]he general rule is that a remand for resentencing allows the district court to conduct a de novo review."). If evidence at resentencing suggests that direct valuation is difficult or impossible, the court must make a determination to that effect before using other measures to estimate the animals' value.[2]

**B**

James Butler also argues that the district court improperly applied a four-level enhancement for being the organizer or leader of a criminal activity involving five or more participants. See U.S.S.G. § 3B1.1. We see no reversible error. The record contains ample evidence that James leased the land on which the illegal hunts occurred, hired employees to help with the hunting operation, and personally guided several clients. Moreover, § 3B1.1(a) only requires that James organized or led one other participant in the criminal operation, see id. app. n.3, and James admits in his briefing that he hired his brother as a guide. Even if we were to credit James' argument that the district court improperly ignored an objection, any such error would be harmless. As such, we affirm on this point.

---

[2] The Guidelines commentary lists "acquisition and preservation" costs as permissible proxies for the value of an animal. § 2Q2.1 app. n.4. But the same note also instructs that any such proxy must be a "reasonable estimate" of the cost of the animal itself. Id. Thus, it is by no means clear that the district court could base its estimate on the entire cost of a guided hunt, including incidental expenses like lodging and accommodations. In light of our disposition of this case, however, we do not need to resolve that question.

## C

James Butler contests the $25,000 in restitution that he was ordered to pay to the Kansas Department of Wildlife and Parks. We review the legality of a restitution order de novo and the factual findings underlying the order for clear error. United States v. Herndon, 982 F.2d 1411, 1420 (10th Cir. 1992).

The MVRA makes restitution mandatory for any offense against property under Title 18 of the United States Code in which an identifiable victim has suffered a physical injury or pecuniary loss. 18 U.S.C. § 3663A(c)(1). Conspiracy in violation of 18 U.S.C. § 371 is covered by the MVRA when the underlying object of the conspiracy is an offense against property. See United States v. Quarrell, 310 F.3d 664, 678 (10th Cir. 2002). Although we have not previously spoken on the matter, we agree with other circuits that conspiracies to violate the Lacey Act qualify as offenses against property for the purposes of the MVRA. See United States v. Bruce, 437 F. App'x 357, 366-67 (6th Cir. 2011) (unpublished); United States v. Bengis, 631 F.3d 33, 38-41 (2d Cir. 2011). In reaching this conclusion, we rely on the fact that the several states own animals within their boundaries in a sovereign capacity. See New Mexico State Game Comm'n v. Udall, 410 F.2d 1197, 1200 (10th Cir. 1969). ("[I]nsofar as wild animals within a state are capable of ownership, they are owned by the state in its sovereign capacity for the benefit of its people, with the resulting right to regulate the taking thereof.").[3] Thus, committing

---

[3] It would be interesting to engage in the centuries-old inquiry into whether the taking of wildlife can best be regulated under the common law theories of res nullius, res

Continued . . .

harm against the wildlife in a state is tantamount to committing harm against that state's property for the purposes of the MVRA.

James also maintains that Kansas cannot be a victim under the MVRA, but our precedent firmly forecloses this argument. Quarrell, 310 F.3d at 677 ("[T]he government can be a 'victim' under the MVRA."). Because wildlife is property of the state, and the state can be a victim under the MVRA, it follows that the district court properly designated Kansas as the victim of James' poaching.

We further hold that the district court properly concluded that Kansas suffered a loss. The PSR and evidence submitted by the government indicate that deer were not tagged immediately or not tagged at all during James' guided hunts. Such failures prevent Kansas from accurately managing its deer population and can lead to overharvesting. In concluding that this was a cognizable injury and constituted a pecuniary loss to Kansas, the district court did not commit clear error.

**D**

The district court imposed special conditions of supervision on James preventing him from hunting, fishing, or trapping wildlife. James argues that these conditions are overbroad and interfere with his occupation. We review a district court's decision to impose special conditions of supervision for abuse of discretion. United States v. Hahn, 551 F.3d 977, 982 (10th Cir. 2008). The sentencing court generally enjoys broad

communis, or res publica. But we will leave such philosophical debate to the academy and resort to the established precedent of our constituent states in the circuit.

-13-

discretion in setting the conditions of supervised release. United States v. Begay, 631 F.3d 1168, 1174 (10th Cir. 2011).

Under the conditions imposed by the district court, James "may not hunt, fish or trap any wildlife, nor accompany others engaged in such activity, nor provide guiding, outfitting or other hunting, fishing, or trapping related services." The district court deemed these conditions appropriate in light of James' "demonstrated history of violating regulations and laws governing activities of this type." Rejecting James' argument that he unknowingly committed many violations, the court specifically found that he encouraged poaching to make money and instructed others to conceal illegal activity from law enforcement.

Conditions of supervised release are permitted if they relate to the offense, afford deterrence to the criminal conduct, protect the public from further crimes, and provide the defendant with rehabilitative training. See 18 U.S.C. § 3583(d). However, restrictions that limit a defendant's employment opportunities are subject to special scrutiny. See U.S.S.G. § 5F1.4. Such limitations are permissible only if they bear a "reasonably direct relationship" to the crime and they are "reasonably necessary to protect the public." § 5F1.4(a), (b). Further, if a court determines that this standard is met, it may only impose the condition "for the minimum time and to the minimum extent necessary to protect the public." § 5F1.5(b). A district court's duty to specifically find that a restriction is minimally restrictive is "mandatory." United States v. Souser, 405 F.3d 1162, 1167 (10th Cir. 2005). We have consistently vacated conditions that interfere with

a defendant's occupation when no such finding is made. See United States v. Mike, 632 F.3d 686, 698 (10th Cir. 2011); United States v. Wittig, 528 F.3d 1280, 1288-89 (10th Cir. 2008); Souser, 405 F.3d at 1167.

Since 2006, James has worked as the business manager of a commercial deer operation owned by a third party. The restrictions imposed would plainly prevent him from continuing in this position or others similar to it, and the sentencing record is devoid of any finding that the "occupational restriction is the minimum restriction necessary." Souser, 405 F.3d at 1167. Because the district court did not engage in the necessary fact-finding, we vacate the special conditions.

## E

Finally, James argues that his forty-one-month sentence was unreasonable. Because we vacate James' sentence and remand for resentencing on other grounds, we do not reach the substantive reasonableness inquiry. See United States v. Kaufman, 546 F.3d 1242, 1248 (10th Cir. 2008).

## III

We **AFFIRM** the district court's imposition of a leader or organizer enhancement to James Butler under Guidelines § 3B1.1 and the requirement that James pay $25,000 to Kansas under the MVRA. However, because the court incorrectly calculated the market value of the animals involved and imposed special conditions of supervision that interfere with James Butler's occupation without making requisite findings, we **VACATE** James and Marlin Butler's sentences and **REMAND** for resentencing. Appellant's motion to

-15-

supplement the record and for leave to file supplemental briefs is **DENIED**.