UNITED STATES of America,
Plaintiff–Appellee,

v.

Marvin CARPENTER,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

CARPENTER'S GOLDFISH FARM,
Defendant–Appellant.

Nos. 90–10245, 90–10246.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 15, 1991.

Decided May 15, 1991.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Robert A. Giovacchini, Fresno, Cal., for defendants-appellants Marvin Carpenter and Carpenter's Goldfish Farm.

Donald W. Searles, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee U.S.

[redacted]

Before BEEZER and NOONAN, Circuit Judges, and SINGLETON *, District Judge.

NOONAN, Circuit Judge:

Marvin Carpenter (Carpenter) and Carpenter's Gold Fish Farm, Inc. (the company) were convicted of making false statements to the United States Fish and Wildlife Service (the Service) in violation of 18 U.S.C. § 1001; of killing migratory birds in violation of the Migratory Bird Treaty Act, 16 U.S.C. § 701; and, of violating the Lacey Act, 16 U.S.C. § 3372 by acquiring migratory birds killed in violation of federal law. They appeal.

The case poses a farming culture in which birds are threats to the farmer's livelihood against a national standard protective of migratory birds. The national standard must prevail but no more oppressively upon the farmer than Congress has provided. We affirm the convictions of violating the False Statement Act. We reverse the convictions of violating the Lacey Act and remand for sentencing under the Migratory Bird Treaty Act.

## THE EVIDENCE

Carpenter began his goldfish farm in 1970 on 20 acres of farm land a few miles south of the city of Merced, California. The operation grew steadily and by 1988 consisted of approximately 450 acres of ponds breeding some 2 million fish per month. Birds were a problem.

* The Honorable James K. Singleton, United States District Judge for the District of Alaska, sitting by designation.

According to the evidence at trial, Carpenter employed persons whose sole function was to shoot birds. The employees also poisoned the birds with sodium cyanide and trapped them in leg traps in which the birds died. The exact number of birds killed during the period of the indictment, 1983 to 1988, was not proved, but according to testimony at the trial Carpenter conceded that there had been "a massacre." Between 1983 and 1988 the company bought over 60,000 rounds of ammunition. The evidence of the lethal "birdmen," hired by Carpenter, indicated that thousands of birds were dispatched each year by shooting, poisoning or trapping. Most of the birds either decomposed in the ponds, were buried in pits, or were burned in an incinerator on the company's property.

In 1984 a state game warden advised an employee that a complaint had been received about wounded birds and that the shooting would have to stop. As a result, Carpenter decided to obtain a federal permit to kill a limited number of specified birds. On March 1, 1984 the first of these permits was issued by the Service. It permitted the company to take, by shooting only, a total of 50 of any combination of great and snowy egrets and great blue and black crowned night herons during the year 1984. Carpenter's purpose in obtaining the permit was to enable employees to tell inquiring game wardens that the company had a permit to kill birds. In practice, no attention was paid to the limits or specifications of the permit. In December 1984 the company reported that it had killed exactly 50 migratory birds of the four named species. The report was false. Carpenter obtained a second permit from the Service in November of 1986. A similar report in regard to this permit, signed by Carpenter in 1987, was also false.

A federal wildlife agent went to the farm in February 1988 to investigate complaints about killed birds. The agent ordered the company to cease all lethal means of bird control. After the agent's visit, Carpenter told an employee to "pick up all the traps, hide the chemicals and get rid of the cyanide" because "the feds would be coming in." Federal agents returned to search the farm in April pursuant to warrants.

## PROCEEDINGS

The foregoing evidence was presented by the government to a jury which convicted the company on two false statement counts, Lacey Act counts and Migratory Bird Treaty Act counts. Carpenter was convicted on one false statement count and on the same Lacey Act and Migratory Bird Treaty Act violations.

The court construed the Migratory Bird Treaty Act offenses to be lesser-included offenses within the Lacey Act and sentenced Carpenter and the company on the Lacey Act violations and on the false statement violations. The company received a fine and probation. Carpenter was sentenced to 13 months in prison, fined and put on probation for five years.

Carpenter and the company challenge their convictions on various grounds.

## ANALYSIS

### The Lacey Act

■ The Lacey Act provides that it is unlawful for any person "to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law." 16 U.S.C. § 3372(a)(1) (1988). The government's position is that Carpenter and the company violated this statute by acquiring birds taken in violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703.

The government's position is contrary to the plain words of the statute. In order to violate the Lacey Act a person must do something to wildlife that has already been "taken or possessed" in violation of law. The government's position collapses the two steps required by the statute into a single step—the very act of knowingly taking the bird in violation of laws is, in the government's view, the act of acquiring the bird. That is not the meaning of the statute. The bird must be taken before acquiring it violates the Lacey Act.

The government's position also is contrary to the usual rule of statutory inter-

pretation that words are to be judged by their context and that words in a series are to be understood by neighboring words in the series. Here the statute enumerates a variety of ways in which birds, unlawfully shot, could be made a subject of acquisition. The verb "to acquire" is *eiusdem generis* as "sell," "receive," "purchase." The verb "acquire" has no similarity to "to shoot." The kind of acquiring condemned is of a bird already taken.

If there were ambiguity in the statute we would reach the same result by the general rule of lenity in interpreting a criminal statute. *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752–53, 64 L.Ed.2d 381 (1980). The statute, however, is not ambiguous, and we do not need to invoke the sensible rule of construing criminal statutes in favor of the defendant charged with the crime.

■ Again, if there were ambiguity in the statute, its purpose as set out in its legislative history would make crystal-clear that the government has found an entirely inappropriate way of convicting the defendants here. The government quotes a single sentence out of context stating that in 1981 protection for migratory birds was "restored to provide a more adequate remedy for some violations involving massive numbers of birds." S.Rep. No. 123, 97th Cong., 1st Sess. 4, *reprinted in* 1981 U.S. Code Cong. & Admin.News 1748, 1751. But the same report makes clear that the purpose of the original Lacey Act was "to outlaw interstate traffic in birds and other animals illegally killed in their State of origin." *Id.* at 1749. The purpose of the 1981 amendments was to deal with "a massive illegal trade in fish and wildlife and their parts and products." *Id.* at 1748. The Lacey Act, as amended, did not intend to duplicate the Migratory Bird Treaty Act by making the very act of killing a bird a crime because the bird when shot fell on the property of the shooter. The Lacey Act convictions are accordingly reversed.

## Evidentiary Rulings

■ The defendants challenge the admission of acts of Carpenter prior to the date of the indictment that show he had for years engaged in the routine killing of birds. This evidence was permitted after defense counsel's opening statement portrayed Carpenter during the period covered by the indictment as an absentee owner who had little knowledge of the daily operation of the fish farm or the number of birds daily killed. In so arguing the defendants squarely placed the question of Carpenter's knowledge at issue, and the evidence of his prior bad acts was therefore admissible under Federal Rules of Evidence 404(b).

■ The defendants also challenge the admission of evidence of a video tape showing the execution of a federal search warrant during which the "bird pits" in which the bodies of the birds were buried were dug up. The video also showed bird carcasses in an incinerator which Carpenter had built to dispose of the birds. The video tape lasted one and one half hours.

The defendants contend that the video was inflammatory. As described, it was gruesome, showing dead bird carcasses, decomposed bird remains, bird feathers and charred bird parts. The defendants claim that the prejudicial effect clearly outweighed the probative value of the video tape.

The admissibility of the video tape is a close question. The government justifies it as explaining the testimony of the agents who executed the search warrant and as tending to refute the defendants' primary defense that only a few hundred birds had been killed over the five years covered by the indictment. The government contends the level of gruesomeness did not reach that found in photographs of human victims of homicide, which have been found admissible. *See United States v. Boise,* 916 F.2d 497, 504 (9th Cir.1990). Discretion to admit evidence means freedom to reach a result an appellate court might not reach. We cannot say that the district court abused its discretion.

## The Sufficiency of the Evidence on the False Statement Counts

■ Carpenter challenges his conviction of making a false statement. He contends

that the evidence was insufficient to prove beyond a reasonable doubt that he signed the 1987 annual report knowing the information in it was false. Carpenter's evidence at the trial was that at the time he signed the report he was heavily involved in a rock plant business and devoting a minimum of time to the fish farm.

Carpenter's evidence was heard by the jury but did not convince them. On appeal, we look at the evidence from the point of view of the government. There was substantial evidence that Carpenter was well aware of the policy of the company to kill birds in large numbers and therefore he was well aware that the report stating that only 50 had been killed was false.

The company also challenges its conviction on the ground that neither of its principal officers were convicted of making a false statement in the 1984 report. However, an employee, authorized by the company, did make the statement and he knew the statement was false. His action creates the criminal liability of the company.

### The Necessity Defense

█ Pretrial, the defendants filed a notice of intent to raise the defense of necessity. Twice during the trial the court ruled that evidence as to necessity was not relevant. However, the court gave an instruction to the jury on the necessity defense. The defendants contend that the court's inconsistent rulings prejudiced them. At no point did the defendants make a proffer of evidence on the necessity defense. They cannot now complain that their evidence was not before the jury.

### Variance From The Indictment

█ The indictment specified the approximate number of birds killed. The evidence did not establish any specific number of birds killed, although a large quantity was proved to have been killed. The government was required to prove only that more than 50 birds had been killed in 1984 and 1987 in order to establish the violations of the False Statement Act, and the government needed to prove only that a single

bird was killed to establish a violation of the Migratory Bird Treaty Act. The numbers specified in the indictment were approximations. There was no prejudice to the defendants in what the government did prove.

### Sentencing

Carpenter challenges the sentence he received on several grounds. We do not rule on these challenges. As his Lacey Act convictions, which were Class A misdemeanors, have been reversed, the district court should have the opportunity to resentence him. We assume that having been successful on his appeal he will not receive a more severe sentence under the Migratory Bird Treaty Act, in terms of which his offenses are Class B misdemeanors, 16 U.S.C. § 707(a) (1988), than he received under the Lacey Act. A new presentence report and a new sentencing hearing should be had. Similarly, the company should be re-sentenced.

AFFIRMED, in part, REVERSED, in part, and REMANDED.