UNITED STATES of America

v.

Lawrence J. ROMANO.

Cr. Action No. 95–10222.

United States District Court,
D. Massachusetts.

June 21, 1996.

Michael O. Jennings, Springfield, MA, for Defendant.

Nadine Pellegrini, U.S. Attorney's Office, Boston, MA, for U.S.

### MEMORANDUM REGARDING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

PONSOR, District Judge.

### I. INTRODUCTION

On July 7, 1995, a grand jury returned an eight-count indictment against the defendant, Lawrence J. Romano, charging him with violations of the Lacey Act Amendments of 1981 ("the Lacey Act" or "the Act"), 16 U.S.C. §§ 3371 *et seq.*, which prohibit, in relevant part, a purchase of wildlife taken, possessed or transported in violation of state law. Defendant has filed a motion to dismiss the indictment. This memorandum addresses that motion.

According to the indictment, beginning in 1989 and continuing through 1994, Romano, a resident of Massachusetts, periodically traveled to Alaska with his family on recreational hunting trips. On each occasion, he applied for and received an Alaska *resident* hunting license by providing false information to the licensing authorities. He then bought the services of a professional guide to assist him

in hunting game. At the conclusion of each trip, Romano transported his "trophies"— *i.e.,* animals he had shot—from Alaska to Massachusetts, occasionally via other states, to put in his Mt. Washington, Massachusetts home.

Counts 1 through 7 charge Romano with knowingly engaging in conduct involving the sale or purchase of wildlife having a market value in excess of $350—altogether, four caribou, two moose, two Dall sheep, and a brown bear—by knowingly transporting, receiving, acquiring and purchasing in interstate commerce wildlife taken, possessed and transported in violation of Alaska Stat. § 16.05.330(a), which prohibits hunting without an appropriate license. *See* 16 U.S.C. §§ 3372(a)(2)(A), 3373(d)(1)(B). Count 8 seeks the forfeiture of all animals and their constituent parts described in Counts 1 through 7. *See id.* at § 3374.

Romano has launched a host of challenges to the indictment; these fall into five broad categories: (1) whether the Lacey Act applies to Romano's alleged conduct; (2) whether the indictment alleges a violation of state law and, relatedly, whether such a violation qualifies as an underlying state law violation for purposes of the Lacey Act; (3) whether Congress has the power to regulate recreational hunting; (4) whether the Alaska statute violates constitutional principles embodied in the federal and Alaska constitutions; and (5) whether the applicable statute of limitations bars Count 1 of the indictment. The court will address each category in turn.

## II. *THE LACEY ACT*

The Lacey Act dates back to the turn of the century. Congress passed the statute in 1900 to fight "pot hunters" engaged in the wholesale slaughter of animals for sale. Since then, the Act has been amended several times, most recently in 1981 and 1988, to modify the class of activities subject to its civil and criminal penalties. In effect, the Act buttresses existing wildlife-protection laws by imposing federal sanctions for interstate or foreign commerce in fish, wildlife or plants that have been taken, possessed, transported or sold in violation of any state, federal or foreign law. *See generally* S.Rep.

No. 123, 97th Cong., 1st Sess. 1–2 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1748, 1748–49.

The government has charged Romano with seven violations of 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(B). Romano challenges the government's interpretation of the Lacey Act and its application to his alleged conduct. His arguments require a careful review of these statutory provisions.

The Act begins with a general description of unlawful conduct. Section 3372(a)(2)(A) states as follows:

> It is unlawful for any person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law[.]

Two distinct elements comprise this general description. First, fish or wildlife must be taken, possessed, transported or sold in violation of state or foreign law. Second, the fish or wildlife must be imported, exported, transported, sold, received, acquired or purchased in interstate or foreign commerce.

Succeeding provisions describe the penalties for specific conduct. One such provision, § 3373(d)(1)(B), provides in relevant part:

> Any person who violates any provision of this chapter . . . by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation, shall be fined not more than $20,000, or imprisoned for not more than five years, or both.

To paraphrase, § 3373(d)(1)(B) states that any person who knows that certain fish or wildlife (in excess of $350) have been illegally taken, and who nevertheless sells or purchases such wildlife, will be subject to criminal prosecution.

As Romano correctly points out, it is not immediately apparent that § 3373(d)(1)(B)

applies to his alleged conduct here. That section generally describes an illegal taking *followed by* a sale or purchase. According to this indictment, however, Romano allegedly purchased the services of a guide and *then* hunted wildlife in violation of state law.

On closer inspection, Romano's argument loses its initial lustre. Another provision of the Lacey Act, § 3372(c)(2)(A), enacted in 1988, fills in this lacuna. It states:

> It is deemed to be a purchase of fish or wildlife in violation of this chapter for a person to obtain for money or other consideration guiding, outfitting, or other services for the illegal taking, acquiring, receiving, transporting, or possessing of fish or wildlife.

Section 3372(c)(2)(A) clearly states that any person who purchases guiding services for the (prospective) illegal taking of fish or wildlife violates the law. This is exactly what the government has alleged here: Romano purchased the services of a guide and then hunted wildlife in violation of Alaska law.[1]

Romano pushes his argument one step further. His fine-tuned reasoning requires careful study. Sections 3372(a)(2)(A) and 3373(d)(1)(B), he contends, are phrased in terms of an illegal taking of fish or wildlife *followed by* a purchase. Section 3372(c)(2)(A), on the other hand, puts the purchase *before* the illegal taking. He concludes that § 3372(c)(2)(A) is flatly inconsistent with the general rule established in §§ 3372(a)(2)(A) and 3373(d)(1)(B), and, therefore, performs no meaningful interpretive function.

Romano relies on *United States v. Carpenter*, 933 F.2d 748 (9th Cir.1991), for support. There, a jury convicted the defendant under § 3372 for illegally shooting birds that were feeding on his farm-raised goldfish. Overturning the conviction, the Ninth Circuit held that § 3372(a)(1) sets forth two discrete, sequential steps for a violation of the Lacey Act. It held that the government's position in that case—collapsing a "taking" and "acquiring" into one step—violated the plain meaning of the statute. *Id.* at 750–51.

Significantly, *Carpenter* was not a "sale" or "purchase" case. In a later case, however, the Ninth Circuit upheld a conviction under § 3373(d)(1)(B) for a "sale" of wildlife as defined by 16 U.S.C. § 3372(c)(1). *See United States v. Atkinson*, 966 F.2d 1270 (9th Cir.1992). That provision—§ 3372(c)(2)'s mirror-twin—defines a "sale" to include the provision of guiding services for money or other consideration for the illegal taking, possessing or transporting of wildlife. Thus, like § 3372(c)(2), § 3372(c)(1) puts the sale or purchase before the underlying state-law illegality. The Lacey Act's legislative history supports this interpretation. *See* 1988 S.Rep. No. 563, 100th Cong., 2d Sess. 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5366, 5370.

■ *Atkinson* illustrates the proper approach. Section 3372(c)(2)(A) states that a purchase of guiding services for purposes of taking, possessing or transporting wildlife in violation of, or in a manner unlawful under, state law is illegal. Its meaning is plain. Any other interpretation would impermissibly distort Congress's legislative design. *United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 751–52 (1st Cir.1985).

In the alternative, Romano argues that a hunter cannot be held liable under § 3372(c)(2)(A) unless his paid-for guide condoned or conspired in the illegal activity. Again, that provision plainly states that it is unlawful to purchase the services of a guide for an illegal hunt. The most natural, and reasonable, interpretation of this provision is that the person buying the services and the person doing the illegal hunting are one and the same. If Congress had intended a requirement that the guide condone or conspire in the illegal hunting, it simply would have said so.

■ Romano's last argument concerns a clarification in the elements of the alleged crimes. Section 3372(a)(2)(A) states that it is unlawful to purchase certain wildlife "in interstate or foreign commerce." Sections

---

1. The indictment also fairly alleges that Romano *transported* wildlife taken in violation of, or in a manner unlawful under, state law; however, such conduct, though deemed unlawful under § 3372(a)(2)(A), does not give rise to criminal liability under § 3373(d)(1)(B).

3373(d)(1)(B) and 3372(c)(2)(A), on the other hand, do not insist that a purchase occur in interstate commerce. In general, inclusion of particular language in one part of a statute and omission of the same language in another is deemed intentional. *Rodriguez v. United States,* 480 U.S. 522, 525, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 702 (1st Cir.1994). But here, given a series of interlocking criminal provisions, which refer to and define one another, and which incorporate identical means of committing an offense, some of which include an interstate commerce limitation and some of which do not, uniform inclusion of the limitation cures any resulting ambiguity. *United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971); *United States v. Gibbens,* 25 F.3d 28, 35 (1st Cir.1994). *But see United States v. Heuer,* 749 F.Supp. 1541, 1542 (D.Mont.1989), *aff'd on other grounds,* 916 F.2d 1457 (9th Cir.1990) (concluding that § 3372(c)(2) does not require purchase to occur in interstate commerce). Accordingly, this court holds that any alleged "purchase" resulting in criminal liability must occur in interstate commerce, an element the government will need to prove in this case.

In sum, the court holds that the defendant's alleged conduct falls within the scope of the Lacey Act's criminal provisions.

### III. *THE ALASKA LAW*

Romano next argues that the indictment does not allege sufficient facts to establish a violation of Alaska law, or, in the alternative, that the alleged violation does not give rise to liability under the Lacey Act.

Alaska Stat. § 16.05.330(a)(2) reads in relevant part:

Except as otherwise permitted in this chapter, without having the appropriate license or tag in actual possession a person may not engage in ... hunting, trapping, or fur dealing[.]

Section 16.05.330(b) continues:

When obtaining the appropriate license or tag in (a) of this section, an applicant who asserts residency in the state shall provide the license vendor with the proof of residence that the [State of Alaska] requires by regulation.

Section 16.05.420(a) completes the relevant statutory framework:

A false statement of a material fact in an application for a license, tag, or permit issued under AS 16.05.330 [through] 16.05.430 voids the license, tag, or permit for which the application is made.

■ Assuming the allegations in the indictment to be true, Romano clearly violated Alaska law. In order to obtain a resident hunting license, he supplied false information concerning his residency status to the licensing authorities. That information, contrary to Romano's assertions, amounts to a "false statement of material fact." But for Romano's falsehood, the state authorities would not have issued him a resident license. Consequently, Romano hunted with a void license, a violation of Alaska law. There is no ambiguity, no uncertainty and no vagueness on this point.

Romano's second line of argument—*i.e.,* a violation of Alaska's hunting license law does not give rise to Lacey Act liability—fares no better. The Lacey Act prohibits certain activities involving fish, wildlife, or plants taken, possessed, transported, or sold "in violation of any law or regulation of any State." *See* 16 U.S.C. § 3372(a)(2). Generally, the phrase "any law or regulation" has been interpreted to mean laws and regulations designed and intended, first and foremost, to protect wildlife. *See, e.g., United States v. Molt,* 599 F.2d 1217, 1218–19 (3rd Cir.1979); *see also* S.Rep. No. 123, *supra,* at 5–6, *reprinted in* 1981 U.S.C.C.A.N. at 1752–53 (discussing *Molt* ). Romano claims that, since Alaska's hunting license law generates revenue for the state, it must be considered "revenue-producing," first, and "wildlife-related," a distant second.

The Lacey Act's plain language, as well as its legislative history, vitiates this argument. Title 16, United States Code, Section 3372(c) states that a sale or purchase of a hunting license or permit for purposes of illegally taking or transporting wildlife is unlawful. Moreover, in its report on the 1981 amendments to the Act, the Senate Committee on

Environment and Public Works criticized the *Molt* decision. It wrote:

> The wording of [the court's] interpretation is too restrictive. For example, under a narrow reading of the *Molt* decision it might be argued that a State's hunting license law which is revenue-producing is not covered by the Lacey Act. However, such a law clearly does relate to wildlife and it is the Committee's intent that it be covered by the Act.

S.Rep. No. 123, *supra*, at 5, *reprinted in* 1981 U.S.C.C.A.N. at 1753.

■ Certainly some state law violations do fall outside the perimeters of Lacey Act liability, *see id., reprinted in* 1981 U.S.C.C.A.N. at 1753 (public health and safety laws not covered), but a violation of Alaska's hunting license law is not one of them. Hunting licenses effectively control the number of hunters in the field during a given season as well as provide funds to regulate hunting and other activities affecting wildlife in the state. In short, Alaska's hunting license law is sufficiently "wildlife-related" to fall within the scope of the Lacey Act.

### IV. *THE COMMERCE POWER*

Romano claims next that Congress exceeded its authority in making it an offense to hire a guide, hunt wildlife for sport without a license, and transport the kill out of state. The argument requires a review of Congress's authority to regulate interstate commerce.

■ The Commerce Clause gives Congress the power to "regulate Commerce ... among the several states." U.S. Const., Art. I, § 8, cl. 3. The Supreme Court has construed the Clause broadly to authorize the regulation of (1) the channels or facilities of interstate commerce, (2) the instrumentalities of, or persons and things moving in, interstate commerce, and (3) activities conducted wholly within a state that, taken alone or in the aggregate, substantially affect interstate commerce. *See United States v. Lopez,* — U.S. —, — – —, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995). The Lacey Act embodies a valid exercise of Congress's commerce power with respect to the first and third categories of regulation.

It is well established that Congress has the power to remove goods acquired by or incident to some unlawful activity from the channels of interstate commerce. In *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Supreme Court upheld a federal law prohibiting the shipment in interstate commerce of lumber manufactured by employees working for other than prescribed wages and hours, and penalizing employers who hired workers engaged in interstate commerce in violation of the wage and hour provisions. "Congress, having by the present Act adopted the policy of excluding from interstate commerce all goods produced for the commerce which do not conform to the specific labor standards, it may choose the means reasonably adapted to the attainment of the permitted end, even though they involve control of intrastate activities." *Id.* at 121, 61 S.Ct. at 460. Likewise, in passing the Lacey Act, Congress established a policy of removing all illegally taken, possessed, or transported wildlife from the channels of interstate commerce, and, by penalizing sales and purchases of such wildlife, it chose a reasonable means to achieve that end.

■ With respect to the third category of regulation—regulating wholly intrastate conduct that substantially affects interstate commerce—the constitutional test is whether in passing a statute Congress had a rational basis for concluding that the intrastate activity to be regulated substantially affects interstate commerce. *See Lopez,* — U.S. at —, 115 S.Ct. at 1629. Using this standard, the Supreme Court has upheld federal laws that, for instance, control home consumption of homegrown wheat, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), prohibit racial discrimination in restaurants catering to a substantially local clientele, *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), and impose criminal penalties for local loansharking activities, *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

Legislative reports discussing the Lacey Act exhibit Congress's concern for the commercial effects of the illegal trade in fish and wildlife. In 1969, the Senate Committee on Commerce emphasized the practical advantages of a forerunner version of the Act:

From a pragmatic point of view, the protection of an endangered species of wildlife with some commercial value may permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels in a very brief span of time. Potentially more important, however, is the fact that with each species we eliminate, we reduce the pool of germplasm available for use by man in future years. Since each living species and subspecies has developed in a unique way to adapt itself to the difficulty of living in the world's environment, as a species is lost, its distinctive gene material, which may subsequently prove invaluable to mankind in improving domestic animals or increasing resistance to disease or environmental contaminants, is also irretrievably lost.

S.Rep. No. 526, 91st Cong., 1st Sess. (1969), *reprinted in* 1969 U.S.C.C.A.N. 1413, 1415. About ten years later, the Senate Committee on Environment and Public Works noted the "severe" economic repercussions of the illegal trade in fish and wildlife, and reemphasized the importance of enforcing existing wildlife laws to make sure that "endangered species are not further threatened with extinction" and to maintain "healthy wildlife populations for hunting and other recreational purposes." *See* S.Rep. No. 123, *supra*, at 1–2, *reprinted in* 1981 U.S.C.C.A.N. at 1748–49.

Over the years, therefore, Congress has perceived a need to secure the long-term availability of scarce natural resources for commercial purposes. Many agricultural and manufacturing concerns, for example, require a safe and ready supply of fish, wildlife, or plant resources for critical inputs. Other service industries that get their business from hunting, studying, or merely travelling in Alaska's abundant wilderness similarly rely on a healthy population of fish and wildlife. All of these businesses depend on Alaska's wise management of its natural resources to sustain their particular variety of interstate commerce. The Lacey Act offers federal support for such regulation.

The legislative reports admittedly do not *directly* address the situation at issue here: whether a recreational hunter may be held liable for purchasing the services of a guide and hunting wildlife in violation of state law. In *Lopez*, however, the Court emphasized that Congress may regulate even wholly intrastate conduct which, if left unregulated and viewed in the aggregate, will undermine a larger, commercial regulatory scheme. *Lopez* at –– – ––, 115 S.Ct. at 1630–31; *Perez*, 402 U.S. at 154 ("Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.") (emphasis in original) (citation and internal quotation marks omitted). Such is the case here. A solitary unlicensed hunter, who employs the services of a guide and kills wildlife for sport, poses little or no threat to interstate commerce; a rash of illegal hunting, on the other hand, may well result in a reduction in wildlife-related goods and services.

■ Romano nevertheless argues that the Lacey Act, as applied here, unconstitutionally penalizes a wholly private actor. This court disagrees. Congress clearly may regulate private actors so long as they exhibit a substantial connection to a commercial actor or activity. *See, e.g., Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (upholding statute penalizing anyone who maliciously uses fire or explosives to damage or destroy any real or personal property used in any activity affecting interstate commerce); *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (holding that the term "enterprise" in RICO statute is not limited to entities with an economic or profit-seeking motive). As explained above, an illegal hunter clearly demonstrates such a nexus.

Given this background, the court returns to the question at hand: whether Congress may penalize the defendant's alleged conduct in this case. The answer is "yes." Congress may employ reasonable means to rid the channels of interstate commerce of illegally taken wildlife. *Darby,* 312 U.S. at 114, 61 S.Ct. at 457. Moreover, hunting wildlife in violation of state law is conduct that, viewed in the aggregate, may have a substantial effect on interstate commerce. Congress, therefore, may interdict it. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

## V. *OTHER CONSTITUTIONAL CONCERNS*

Romano next contends that Alaska's hunting license law violates the Commerce, Privileges and Immunities, and Equal Protection Clauses of the federal Constitution, as well as the equal protection guarantee of the Alaska constitution.

A critical distinction for purposes of this argument is whether the Alaska law burdens a fundamental right, necessitating strict scrutiny, or does something else, calling for less demanding review. Romano's claims clearly fall on the "something else" side of the line. In *Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), the Supreme Court rejected a similar challenge brought by a group of Minnesotans to Montana's increased hunting license fees for nonresidents. The Court held that "[w]hatever rights or activities may be 'fundamental' under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by nonresidents in Montana is not one of them." *Id.* at 388, 98 S.Ct. at 1862–63. Similarly, here, caribou hunting, or brown bear hunting, or any other recreational hunting in Alaska for that matter, is not essential to the defendant's, let alone the nation's, livelihood. The *Baldwin* Court next determined that Montana's fee scheme did not impermissibly discriminate against nonresidents in violation of the Equal Protection Clause because it was rationally related to achieve the preservation of a scarce resource. *Id.* at 390, 98 S.Ct. at 1863–64. The same can be said of Alaska's law.

Romano further contends that Alaska's law unconstitutionally discriminates against interstate commerce. Recreational hunting is not commerce. *See id.* at 388, 98 S.Ct. at 1862–63. Thus, even though it discriminates against nonresidents, Alaska's law is not subject to strict scrutiny. And even assuming Alaska's law somehow *indirectly* burdens interstate commerce—by, say, discouraging a small number of prospective recreational hunters from coming to the state—it still passes constitutional muster. Whatever the incidental burden, it is *not* "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In short, regulating nonresident recreational hunters is a reasonable means of protecting a scarce natural resource.

Finally, Romano asserts that Alaska's hunting license law violates the Alaska constitution. Specifically, he argues that the law's twelve-month durational residency requirement, Alaska Stat. 16.05.940(26), violates the state constitution's equal protection guarantee. This court, of course, cannot speak authoritatively on Alaska law. It is extremely likely, however, that Alaska courts would follow the federal lead on this issue.

The federal Constitution does not prevent a state from imposing durational residency requirements for certain public services. *See, e.g., Martinez v. Bynum,* 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983) (upholding durational residency requirement for public education). Assuming that the "service" in question is not a fundamental right protected by the Constitution, a *bona fide* residency requirement, uniformly applied, will be upheld if there is a rational basis for it. *See id.* at 328 n. 7, 103 S.Ct. at 1842 n. 7. As the court noted above, recreational hunting is not a fundamental right, and the State of Alaska has a rational basis for maintaining a two-tier hunting license fee scheme in order to protect its scarce resources. In light of its federal constitutionality, this court can say, with little or no reservation, that Alaska's hunting license law does not transgress the Alaska constitution.

In sum, all of Romano's constitutional challenges to the Alaska law are without merit.

## VI. STATUTE OF LIMITATIONS

Finally, Romano claims that the statute of limitations bars Count 1 of the indictment.

■ The federal "catchall" statute of limitations provision, 18 U.S.C. § 3282, governs Lacey Act prosecutions. *See United States v. Thomas,* 887 F.2d 1341, 1348–49 (9th Cir. 1989); *United States v. Borden,* 10 F.3d 1058, 1062 (4th Cir.1993). That provision provides for a five-year limitations period.

With respect to Count 1, Romano argues that the statute of limitations began to run when he illegally "took"—*i.e.,* killed—the brown bear identified in that count, or, alternatively, transported the bear out of Alaska. The government responds that the statute began to run on the day Romano "completed" his offense, which in this case, it contends, was the last time he transported the bear across state lines.

■ Section 3373(d)(1)(B), as amplified by § 3372(c)(2)(A), defines a single, discrete criminal offense: knowingly engaging in conduct involving a sale or purchase of wildlife with a market value in excess of $350, by purchasing the services of a guide for the taking, possessing or transporting of such wildlife in violation of state law. It is not, as the government seems to argue, a continuing offense. Nonetheless, the different means of committing the offense may be charged conjunctively in a single count, and a conviction on that count will stand if the evidence establishing one or more of the means alleged is sufficient to support the verdict. *United States v. Barbato,* 471 F.2d 918, 922 n. 3 (1st Cir.1973).

Count 1 fairly alleges three underlying means to a Lacey Act violation: a purchase of guiding services for the *taking, possessing* and *transporting* of wildlife in violation of, or in a manner unlawful under, state law. The parties apparently agree that Romano's alleged "transporting" of the brown bear activated the statute of limitations; the question is *what* "transporting" activated the statute.

On October 2, 1989, Romano shot and killed the brown bear identified in Count 1. Days later, he apparently transported the bear from Alaska to New York for taxidermy. (The indictment alleges that the bear made its way to Massachusetts via Colorado, not New York, but this point is immaterial for purposes of this discussion.) The government alleges that on January 2, 1992, over two years later, Romano transported the bear across state lines to his Massachusetts home. The grand jury returned the indictment against Romano on July 19, 1995.

■ This court does not credit the argument that multiple acts of "transporting" wildlife—*i.e.,* ones necessary to "complete" the offense—may each establish new beginnings for purposes of the statute of limitations. That construction would result in indefinite exposure to criminal liability and render the statute of limitations virtually meaningless. The statute implies that a purchase of guiding services must be significantly linked to another illegal activity. *See* 16 U.S.C. § 3372(c)(2)(A) (making it unlawful to buy guiding services "*for*" the illegal taking, acquiring, receiving, transporting, or possessing" of wildlife) (emphasis supplied). Here, the only act of transporting even remotely connected to the purchase was the initial movement of the bear out of Alaska.

It is undisputed that Romano killed the brown bear and transported it out of Alaska in October of 1989, more than five years before the grand jury returned its indictment. Accordingly, the court will dismiss Count 1 and the related forfeiture action.

## VII. CONCLUSION

For the foregoing reasons, the court hereby DISMISSES Count 1 of the indictment and otherwise DENIES defendant's motion to dismiss.

A separate order will issue.