The Honorable Billy Joe Purdom State Representative Route 1, Box 135B Yellville, Arkansas 72687-9728
Dear Representative Purdom:
This is in response to your request, on behalf of a constituent, for an opinion on sixteen questions relating to the enforcement and application of an ordinance of Diamond City, Arkansas, which prohibits, by criminal penalty, the use of any hunting device, or the taking of wildlife with any trapping device at any time and the discharge of "any item of firearms" within the city limits of Diamond City.[1] The city limits were apparently expanded by annexation in 1990 to include territory owned by the United States Corps of Engineers adjacent to Bull Shoals Lake. You have enclosed a "packet" of information from your constituent posing sixteen questions about the legality and enforcement of the ordinance. Those questions will be set out and answered separately below.
The first question posed is as follows:
 Is the annexation of the Corps of Engineers land legal on one man's signature?
I assume this question has reference to the fact that the annexation which occurred in 1990 was accomplished pursuant to A.C.A. §§ 14-40-601 to -606 (1987), the subchapter governing so-called "voluntary" annexation upon petition of a majority of the landowners in the affected territory. Apparently, the annexation was accomplished in part by petition signed by one person, a Mr. William D. DeBusk, as Chief of the Real Estate Division of the Little Rock District of the United States Corps of Engineers, which annexation was then approved by the county court and accepted by the Diamond City Council. Assuming that Mr. DeBusk had authority to act on behalf of the U.S. Corps of Engineers in signing the petition (which is a question of federal law), and assuming that the Corps of Engineers represented a majority of the total number of real estate owners in the area affected, and owned more than one-half of the acreage affected, and assuming that all other statutory requirements were complied with, the answer to your question is "yes." See A.C.A. § 14-40-601. The fact that there was only one signatory on the petition does not operate to invalidate it, assuming compliance with the statute. Such sole signatories are not unprecedented in annexation law, and have not been used as a grounds for invalidating petitions, assuming compliance with all relevant statutes. Cf. generally, Board of County Commissioners v.City and County of Denver, 193 Colo. 211, 565 P.2d 212 (1977) (executor of estate owning entire area to be annexed was a proper signatory). Additionally, it has been stated that "[s]tate property may be included in territory annexed to a municipality, as may be territory under exclusive jurisdiction of the federal government." 62 C.J.S. MunicipalCorporations, § 46.
The second question posed is as follows:
 Is there a statute of limitations period of time on an annexation of property of a city, or can it be unannexed in a court ruling?
There is no set period of time the annexation is effective. Once property is annexed under the subchapter in question, it becomes "part and parcel of the limits of the city." See A.C.A. § 14-40-606 (1987). There is a procedure for challenging an attempted annexation (see A.C.A. §14-40-604, authorizing any interested person to institute an action in circuit court within 30 days of the order of the county court to prevent the annexation); and an ordinance of a municipality accepting property annexed pursuant to these statutes is subject to the people's right of referendum.[2] See Gregg v. Hartwick, 292 Ark. 528, 731 S.W.2d 766
(1987). Both of these avenues of challenge, however, must be exercised within applicable time limits. The action in circuit court to prevent the annexation must occur within thirty days of the county court order as stated above (cf. In the Matter of the Proposed Annexation to the Town ofBeaver, Arkansas, 282 Ark. 516, 669 S.W.2d 467 (1984)), and the people's right of referendum on the city's ordinance accepting the property must be exercised within the applicable time limits for filing a referendum petition. See Arkansas Constitution, Amendment 7 (stating that municipalities may set the deadline for filing such petitions at not less than thirty days nor more than ninety days after passage of the ordinance). See also Cobb v. Burress, 213 Ark. 177, 209 S.W.2d 694
(1948). If these avenues have not been timely pursued, the only method for "unannex[ing]" land from a municipality appears to be through the procedures governing "detachment" and "reduction to acreage."[3] See
A.C.A. §§ 14-40-1801 to -1903 (1987) (regarding "detachment," as amended by Act 140 of 1997 to authorize detachment of unimproved and uninhabited "wet lands" without an election), and A.C.A. §§ 14-41-301 to -307 (1987) (regarding reduction to acreage).
The third question posed is as follows:
 Diamond City passed this hunting ordinance on November 20, 1996, then on January 21, 1997 the city council voted unanimously to have a goose hunt in the park, which is part of the city limits of the annexation of the Corps land. Does this make void and or null the hunting ordinance they themselves just passed on the Corps land?
It is noted that the council "voted unanimously" to have a goose hunt. It is not indicated whether this vote was reduced to an ordinance which in some way could be said to impliedly repeal or amend the earlier ordinance. I have not been provided with any facts in this regard, and cannot state whether any such repeal or amendment occurred. Absent an ordinance granting authority for the goose hunt, it is my opinion that the vote to authorize this hunt cannot be said to nullify the earlier ordinance. The nature of the argument for nullification appears to be one in "estoppel," that is, because the city council acted in contravention of the ordinance, it has forfeited the right to enforce the ordinance against others. It is generally held, however, that "the doctrine of estoppel does not . . . apply as against the people in criminal prosecutions, and it has been asserted that the government may be estopped in the enforcement of the criminal laws only by some sound public policy, as when its officers have lured accused into the commission of a crime." 31 C.J.S. Estoppel and Waiver § 174 (footnotes omitted). Seealso 22 C.J.S. Criminal Law, § 92 (stating that "equitable estoppel . . . is never a defense in a criminal prosecution.").
The fourth question posed is as follows:
 Is it legal to pass an ordinance of no hunting, discharge of firearms etc. on this Corps land, when it was annexed for the purpose of fire and police protection only? Note: All the Corps land around Bull Shoals Lake is and always has been considered to be "Wildlife Management Area" by the Corps and Arkansas Game and Fish Commission, with the exception of the parks and campgrounds. How can a city government close it?
As an initial point, it should be noted that annexations cannot occur under the relevant subchapter for partial purposes. As noted earlier, once an area of land is annexed to a city under the subchapter in question, it "shall be deemed and taken to be a part and parcel of the limits of the city or incorporated town, and the inhabitants residing therein shall have and enjoy all the rights and privileges of the inhabitants within the original limits of the city. . . ." A.C.A. §14-40-606 (1987). Thus, ordinances passed by the municipality apply equally to properly annexed territory. The balance of the question above inquires as to the City's authority to prohibit hunting or the discharge of firearms on the Corps property, which it is noted "always has been considered `Wildlife Management Area' by the Corps and the Game and Fish Commission." I must point out that according to my information, the area in question is not a designated "Wildlife Management Area" subject to the specific regulations promulgated by the Game and Fish Commission governing those areas. A portion of the property is, according to my information, a national or state park recreation area, but this appears to be the area excluded by the question above.[4] The balance of the property in question is thus simply owned by the Corps of Engineers. The question thus becomes whether a municipality may adopt a "no hunting, discharge of firearms" ordinance which will be applicable to Corps of Engineers property which was annexed into the city limits. It is my opinion, although the question may to some degree involve the finding of facts, that it in all likelihood may.
The ordinance in question states in its preamble that: "Whereas: The City Council of Diamond City, has determined that there is a need to protect the natural wildlife within our City and surrounding area, and provide penalties for violation thereof." Section 1 states that the ordinance's purpose is to "protect the wildlife within Diamond City. . . ." The ordinance goes on, in the textual sections, to prohibit the use of hunting devices or the taking of wildlife with any trapping device within the relevant area. Ordinance 11-96, Section 1. The ordinance also prohibits the discharge of "any item of firearms" within the city limits. Ordinance 11-96, Section 3.
It is my opinion that while the municipality is not generally empowered to protect "wildlife" (this function in all likelihood belonging exclusively to the Arkansas Game and Fish Commission, see Arkansas Constitution, Amendment 35),[5] it does have the authority to protect its inhabitants from the perceived ill effects of the use or employment of hunting devices, including firearms, within the city limits. Seegenerally, A.C.A. § 14-54-103 (general authority to enact ordinances); §14-55-102 (general authority to enact ordinances); § 14-43-601 (defining municipal affairs); and § 14-16-504 and 14-54-1411 (Supp. 1995) (prohibiting cities from regulating the possession of firearms, but authorizing cities to regulate the "unsafe" discharge of a firearm).[6]
To be a valid enactment, the ordinance must come within the scope of powers granted cities and towns under the statutes promulgated in the proper exercise of police powers and must bear some reasonable relation to the public health, safety, morals, welfare, comfort, or convenience.Wilkins v. City of Harrison, 218 Ark. 316, 236 S.W.2d 82 (1951). While the preamble and purpose provisions of the ordinance refer to the protection of wildlife, which may, in my opinion, be outside the authority of the City, the actual substantive provisions of the ordinance prohibit the use of hunting devices and the discharge of firearms, which can be said to promote the public safety of residents.[7] It has been stated in this regard that: "An act cannot be declared unconstitutional for matters contained in the preamble if the text of the act is free from constitutional objection. When the legislature enacts a statute in accord with its constitutional power, a statement of its reasons will not affect its validity." Sutherland, Statutory Construction, § 20.04. It has also been held, under the "rational basis" test, that legislation will be upheld if there is any reasonable basis to support it (62 C.J.S. MunicipalCorporations § 203), and that in reviewing such legislation, it is not the job of the court to discover the actual basis for the legislation, but rather, the court is allowed to hypothesize to determine whether any rational basis exists which demonstrates the possibility of a deliberate nexus with government objections so that the legislation is not the product of utterly arbitrary and capricious action. See Streight v.Ragland, 280 Ark. 206, 655 S.W.2d 459 (1983).
The fifth question posed is as follows:
 Since the Corps land and water is federal does the City have legal jurisdiction to patrol both?
It is my opinion that the answer to this question is "yes." Title 36 of the Code of Federal Regulations ("CFR"), which governs "water resource development projects . . . administered by the Chief of Engineers," states at Part 327.26 as follows:
 Except as otherwise provided herein or by Federal law or regulation, state and local laws and ordinances shall apply on project lands and waters. This includes, but is not limited to, state and local laws and ordinances governing:
* * *
(b) Hunting, fishing and trapping;
(c) Use of firearms or other weapons. . . .
Moreover, Part 327.8 states that "Hunting, fishing, and trapping are permitted except in areas where prohibited by the District Engineer. All Federal, state and local laws governing these activities apply on project lands and waters, as regulated by authorized enforcement officials." Thus, city enforcement officials have the authority to enforce local ordinances on Corps property and water.
The sixth question posed is as follows:
 Does the stopping of our hunting on this public land discriminate against the poor? Note: The poor do not own their own land to hunt on, and can't afford to lease hunting land, nor belong to a hunting club.
The ordinance makes no classification based upon wealth, but rather, prohibits the use of hunting devices within the city limits by all persons. It is unlikely that such an ordinance would be deemed discriminatory. See Mahone v. Addicks Utility District of Harris County,836 F.2d 921 (5th Cir. 1988); and Little Rock v. Waters, 303 Ark. 363,797 S.W.2d 426 (1990). A charge of discriminatory treatment, even if proven, would also likely fail in light of the fact that poverty, standing alone, does not describe a suspect classification (see Kadrmas v.Dickinson Public Schools, 487 U.S. 450 (1988); Harris v. McRae,448 U.S. 297 (1980); San Antonio Independent School District v. Rodriguez,411 U.S. 1 (1973)); and the fact that "recreational" hunting has been held by the United States Supreme Court not to be a fundamental right. SeeBaldwin, 436 U.S. 371 (1978) and United States v. Romano, 929 F.Supp. 502
(D. Mass. 1996); DeMasters v. State of Montana, 656 F.Supp. 21 (D. Mont. 1986); and Terk v. Ruch, 655 F.Supp. 205 (D.C. Colo. 1987).[8] In the absence of a suspect classification or the involvement of a fundamental right, legislation, even if distinguishing between classes of persons, will be upheld if it is rationally related to achieving any legitimate governmental objective.
The seventh question posed is as follows:
 Does the annexation of this land, and or the no hunting ordinance violate our constitutional rights? Note: Perhaps article No. 9?
It is my opinion, consonant with the discussion above in response to the sixth question posed, that a constitutional challenge based upon individual rights would fail as regards this ordinance. Article 9 of the Arkansas Constitution governs the exemptions of property from seizure or attachment for debt, and details the homestead allowances against such executions. It also addresses the property rights of widows, married women, and minor children. It has no relation to hunting rights.
The eighth question posed is as follows:
 Does no hunting on this land violate animal rights? Note: Is it not cruelty to animals to allow them to overpopulate, starve, inbreed, become sick, weak and diseased?
Although it seems too evident to even warrant a citation of authority, at least one court has had to go to the trouble of mentioning that the rights of animals are not protected by the constitution as are the rights of persons. See Massachusetts Society for the Prevention of Cruelty toAnimals v. Commissioner of Public Health, 339 Mass. 216, 158 N.E.2d 487
(1959).
As to the reference to "cruelty to animals," the relevant Arkansas statutes appear to address "impounded" animals, or animals otherwise in the custody of persons, and not wild animals. See generally, A.C.A. §5-62-101 to -124(Repl. 1993).
The ninth question posed is as follows:
 Is it legally a conflict of interest that four of the six council members that passed this hunting ordinance on November 20, 1996, were appointed, rather than elected by the people of the City?
You have not indicated how or why these council members were appointed, but it is my opinion that if they were regularly appointed under color of law (for example to fill a vacancy), their actions in passing the ordinance are valid. Although it has been stated that "the law favors the election of all officers by the people whenever possible, and that such is the general policy of our government . . . officers may validly be chosen by appointment rather than election, or by a combination of appointive and elective systems." 67 C.J.S. Officers § 35. If the requisite constitutional and statutory procedures were followed in the appointment of these officers, they have equal authority as though they had been elected.
The tenth question posed is as follows:
 Is it legally a conflict of interest that five of the six council members that are still for the no hunting ordinance live on property that joins the Corps? Yet they are speaking for the whole population of the City?
In response to this question, it has been stated that the phrase "conflict of interest," when used to suggest disqualification of a public official from performing his or her duties, generally refers to "a clash between the public interest and the private pecuniary interest of the individual concerned." Gardner v. Nashville Housing Authority of Metro.Gov't. of Nashville and Davidson County, Tennessee, 514 F.2d 38 (6th Cir. 1975). The "conflict of interest" theory is based "on the fact that an individual occupying a public position uses the trust imposed in him and the position he occupies to further his own personal gain. It is the influence he exerts in this official position to gain personally in spite of his official trust which is the evil the law seeks to eradicate." Cityof Coral Gables v. Weksler, 164 So.2d 260, 263 (Fla.App. 1964). Although it is ultimately a question of fact, it is my opinion that the fact of residence near the Corps of Engineers property in question, without more, in all likelihood does not amount to such a particularized or pecuniary interest distinct from the public interest so as to necessitate the council members' recusal from voting on the relevant ordinance.
The eleventh question posed is as follows:
 Is it legal for the Corps to charge a fee to launch our boats at the public launch ramp that is now annexed into the City? Note: Should the City collect the fee now?
I lack the factual basis to fully address this question. As noted previously, however, it is my understanding that a national park recreation area comprises a part of the relevant territory, and that the Corps of Engineers owns the land in question. The fact of annexation of Corps property into the city limits does not translate into a finding that the City now owns the land with a commensurate right to collect the fees and profits arising therefrom. The Corps of Engineers is presumably free to conduct its business whether occurring within or without the limits of a city.
The twelfth question posed is as follows:
 Is it legal for the Corps to spend federal tax money, and make improvements in the park camp grounds, that is now annexed into the city? Note: Should this expense be on the City now?
Again, as noted above, the annexation of the relevant territory does not amount to a transfer of ownership of the property. The City, by virtue of the annexation, has acquired some rights to regulate the Corps of Engineers property, but the Corps of Engineers is presumably free to own and operate property within the limits of a city.
The thirteenth question posed is as follows:
 Is it legal for the Corps to spend our federal tax money to pay the County Sheriff's department to patrol the park camp grounds? Note: Should the City patrol the park at their own expense.
The question of the expenditure of federal monies by the United States Corps of Engineers is a question of federal law. I will note, however, that such law enforcement contracts, with certain limitations and restrictions, are authorized at Title 36 C.F.R. Part 330, which provides at subpart 5, that: "District Engineers . . . are hereby delegated the authority to contract with States or their political subdivisions to obtain increased law enforcement services at Civil Works water resource development projects."
The fourteenth question is as follows:
 Is it legal for Diamond City to allow archery practice in the yards of the residents, yet not allow archery hunting within the city limits, nor the Corps land they now call the city limits?
You have not enclosed any relevant ordinances in this regard, and it is unclear whether Ordinance 11-96 permits the conduct your describe. Assuming, however, that this is indeed the law in Diamond City, the answer to your question is that it is "legal" until and unless such law is successfully challenged as unreasonable or arbitrary. See generally 62 C.J.S. Municipal Corporations § 148. A reasonable basis for the distinction may, in my opinion, be formulated. The city council could have reasonably believed the peril to public safety to be greater in the case of archery use against moving targets (wild animals), than in the case of target practice against stationary inanimate objects. As long as the ordinance in this regard is supported by a reasonable non-arbitrary basis, it will be upheld as against a challenge such as the one outlined in the fourteenth question presented.
The fifteenth question posed is as follows:
 Is there a state law that property annexed into a city has to have city improvements made on it with in a certain period of time?
There does not appear to be any state law setting such a definite period of time. It has been stated generally that: "Lands are proper for annexation if they are platted and held for sale or use as municipal lots; whether platted or not, if they are held to be brought on the market and sold as city property when they reach a value corresponding with the views of the owner; when they furnish the abode for densely-settled community or represent the actual growth of the city beyond its legal boundary; when they are needed for any proper city purpose; or when they are valuable by reason of their adaptability for prospective city uses." See Chastain v. Davis, 294 Ark. 134, 141,741 S.W.2d 632 (1987). Any challenge alleging the failure of the annexed land to meet this criteria was required to have been filed within the time limits specified in A.C.A. § 14-40-604. See In the Matter of the ProposedAnnexation to the Town of Beaver, Arkansas, supra. If no such challenge was timely filed and if no improvements have been made on annexed land, presumably it could be the subject of a petition by the owner under A.C.A. §§ 14-41-301 to -307 to reduce the area to "acreage."
The sixteenth and final question is as follows:
 How can we get this problem to the federal supreme court for a ruling on it?
Although my office is required, pursuant to A.C.A. § 25-16-706, to furnish official legal opinions to various state officers on matters which are pertinent to their official duties, I am statutorily prohibited from the private practice of law. See A.C.A. § 25-16-701. If your constituent believes there are judicial remedies to pursue, private counsel should be obtained for this purpose.
Other potential non-judicial avenues of relief include the institution of proceedings for "detachment," or "reduction to acreage," or the pursuance of state legislation on the subject, or merely influencing the repeal of the "no hunting" ordinance, whether directly through existing council members, or at the next election of city officials.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh
[1] The only ordinance enclosed with your request is No. 11-96, passed on November 20, 1996. It states that the area covered by the ordinance "shall include all land within the city of Diamond City, and extends beyond the city limits to the shoreline of Bull Shoals lake to the North; West; and East. The South boundary shall be the South boundary line of Section 19, T-21-N, R-18-W, and extends West to the shoreline of Bull Shoals Lake; and along the southern boundary of the city limits located in Section 29, T-21 N, R-18-W, and extends East to the shoreline of Bull Shoals Lake." It is my understanding, however, from the information enclosed with your request, that some of this language was "vetoed" by the mayor, and that the only territory now in contention is that within the city limits. You have enclosed no official documents evidencing the veto, and the sixteen questions posed do not inquire about the validity thereof. My review is therefore limited to the application of the ordinance to territory within the city limits.
[2] Ordinance No. 11-96 (the "no hunting ordinance"), although enacted with an emergency clause, was also subject to the people's right of referendum. Some evidence appears in the information enclosed with your request of an effort to obtain a referendum, but this effort was apparently abandoned.
[3] In the correspondence attached to your request, an effort is noted to repeal the 1990 ordinance of the City accepting the annexed property. I have found no applicable cases stating whether this action would be effective to remove the property in question from the City's boundaries. It appears, rather, in light of the specific procedures provided for "detachment" cited above, that a mere repeal of the 1990 ordinance may not have the intended effect.
[4] It should be noted in this regard that Arkansas Game and Fish Commission regulations 18.10 and 18.11 provide respectively, that: "It shall be unlawful to take or attempt to take wildlife in any state or national park in Arkansas or to possess any killing device in said parks," and "[i]t shall be unlawful to possess loaded firearms on any U.S. Corps of Engineers recreation or public use area where prohibiting signs are posted."
[5] Of course, a municipality may, however, regulate the keeping of certain wild or exotic animals within the city limits. See, e.g., City ofWarren v. Testa, 461 N.E.2d 1354 (Ohio 1983), and 62 C.J.S. MunicipalCorporations § 213.
[6] It is interesting to note that A.C.A. § 5-73-127 prohibits the possession of loaded center-fire weapons in many areas of the State, including several areas around Bull Shoals Lake (although the area in question does not appear to be included). The statute also prohibits such possession in "platted subdivisions located in unincorporated areas" (A.C.A. § 5-73-127(a)(7)), but does not mention incorporated areas. One reasonable inference from this omission is that such possession is a matter for regulation by the various cities and towns themselves.
[7] Included in the information enclosed with your request is evidence of public statements by city officials expressing a motivation to protect the safety of inhabitants of the City.
[8] Most of the cases addressing recreational hunting, however, address nonresident "recreational" hunting. Research has disclosed no relevant cases addressing the appropriate constitutional test to be applied to non-recreational or subsistence hunting.